531 A.2d 873

Northwood Nursing and Convalescent Home, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued June 9, 1987, before Judges CRAIG and DOYLE, and Senior Judge BARBIERI, sitting as a panel of three.

*Arlen M. Tompkins, Abrahams & Loewenstein,* for petitioner.

*Bruce G. Baron,* Assistant Counsel, for respondent.

OPINION BY SENIOR JUDGE BARBIERI, October 2, 1987:
Northwood Nursing and Convalescent Home, Inc. (Petitioner) appeals an order of the Department of Public Welfare (DPW), denying Petitioner's appeal from DPW's disallowance of its interest expense on capital indebtedness for 1981 and 1982.

Petitioner is a skilled nursing facility, duly licensed by the Pennsylvania Department of Health, and a provider in the Pennsylvania Medical Assistance Program (Program). Petitioner is a wholly owned subsidiary of Nursecare Health Centers, Inc. (Nursecare), which also owns Union Forge, a nursing home located in New Jersey.

Title XIX of the Federal Social Security Act, 42 U.S.C., §§1396-1396s, establishes the Medical Assistance Program which provides reimbursement for nursing care services to individuals qualifying for medical assistance. By statute,[1] Pennsylvania participates in this program and has developed a state plan for Medical Assistance as required by federal law.[2]

The Program provides for cost-related reimbursement to skilled nursing homes on behalf of eligible individuals whose institutional care in such facilities is prescribed by a physician.[3] Providers enrolled in the Program must submit a "cost report" to DPW within ninety days of the close of each fiscal year.[4] The cost

---

[1] Section 443.1 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* added by Section 5 of the Act of July 31, 1968, P.L. 904, *as amended,* 62 P.S. §443.1.

[2] 42 U.S.C. §1396a.

[3] 62 P.S. §443.1(3).

[4] 55 Pa. Code §1181.64.

reports are used by DPW in determining provider reimbursement. DPW audits the cost reports[5] and makes necessary adjustments to the reimbursement due the provider. The provider then has the right to appeal any adjustment it disagrees with.[6]

Petitioner claimed capital indebtedness expense of $15,010.00, net of $1,095.00 in interest income, on its cost report for fiscal year ending December 31, 1981. On its cost report for fiscal year ending December 31, 1982, Petitioner claimed capital indebtedness expense of $14,257.00, net of $447.00 in interest income earned in that year.

In January of 1983, DPW audited Petitioner's 1981 cost report and offset a portion of Nursecare's 1981 interest income against Petitioner's otherwise allowable capital indebtedness expense for that year. DPW's auditors determined that $93,864.00, of Nursecare's total expenses for 1981 of $140,609.00, was for management services provided to Petitioner. Therefore, a corresponding percentage (66.76%) of Nursecare's 1981 interest income of $47,912.00, or $31,986.00, was offset against Petitioner's capital indebtedness expense of $15,010.00.

In October of 1983, DPW audited Petitioner's 1982 cost report and once again offset a portion of Nursecare's 1982 interest income against Petitioner's capital indebtedness expense for that year. It was determined that $95,058.00 of Nursecare's total expenses for 1982 of $165,986.00, was for management services rendered Petitioner. DPW then offset a corresponding percentage (57.27%) of Nursecare's $43,985.00[7] of interest income

---

[5] 55 Pa. Code §1181.74.

[6] 55 Pa. Code §1181.101.

[7] Finding of Fact No. 27 of the Adjudication below states that Nursecare had earned interest income of $47,985.00 in 1982. Finding of Fact No. 29 states that DPW allocated a percentage of Nurse-

earned in 1982, or $25,190.00, against Petitioner's capital indebtedness expense of $14,257.00. DPW thus disallowed any reimbursement to Petitioner for its 1981 and 1982 capital indebtedness expense.

Petitioner appealed DPW's audits of its 1981 and 1982 cost reports to the Office of Hearings and Appeals. The hearing examiner recommended that DPW find the offset and denial of reimbursement proper. The Office of Hearings and Appeals adopted the recommendation in its entirety, denying Petitioner's appeal. The instant appeal followed.

The facts pertaining to the case before us are undisputed. The sole question we are faced with is whether, under its guidelines and procedures for provider reimbursement, DPW may offset a provider's interest expense on capital indebtedness by a percentage of investment income earned by a parent corporation.

Our scope of review from a DPW determination is limited to determining whether the adjudication is supported by substantial evidence, is in accordance with applicable law, or whether constitutional rights were violated. *Harston Hall Nursing and Convalescent Home, Inc. v. Department of Public Welfare*, 99 Pa. Commonwealth Ct. 475, 513 A.2d 1097 (1986). DPW is the agency charged with overseeing the Program. As such, its interpretations of the regulations concerning reimbursable expense is controlling unless plainly erroneous or inconsistant with the underlying statute. *Department of Public Welfare v. Forbes Health Systems*, 492 Pa. 77, 422 A.2d 480 (1980).

The hearing examiner found that Petitioner and its parent, Nursecare, maintained separate corporate ex-

care's 1982 interest income of $43,985.00. As the parties stipulated to all the findings and the actual amount offset was determined by using the $43,985.00 figure, we will use that figure as the correct one.

istences, each having their own corporate offices, directors, and officers. Petitioner's board of directors consists of two individuals who are also directors of Nursecare's five member board. Petitioner's President, James F. Hubbert, is also President of Nursecare. The hearing examiner found further that, Petitioner was permitted to claim, on its 1981 and 1982 cost reports, certain costs incurred by Nursecare which were properly attributed to Petitioner.

Pennsylvania's reimbursement procedures are contained in the Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual).[8] Section IV(D)(10)(e) of the Manual, known as the "offset rule", provides as follows:

> Interest expense reduced by investment income, except when the investment income is derived from gifts or grants which are restricted by the donor and which are accounted for separately from other funds, will be recognized.

Petitioner contends that the term "investment income" in Section IV(D)(10)(e) refers to income of the provider only and therefore DPW improperly offset a portion of Nursecare's investment income against Petitioner's capital indebtedness expense.

DPW is to determine provider reimbursement in accordance with its Manual and the federal Medicare Provider Reimbursement Manual contained in the Health Insurance Manual (HIM-15),[9] except where the two differ. In such case, DPW is to follow the Manual,

---

[8] The Manual provisions for the relevant period appeared at 8 Pa. B. 2832-2838 (1978) and have been codified in their current amended form at 55 Pa. Code §§1181.201-1181.274.

[9] current version at 1 Medicare and Medicaid Guide (CCH) ¶ 4590-¶ 5999Z-57.

10 Pa. B. 3107 (1980).[10] As the Manual does not specify *what* investment income is to be offset, we must refer to HIM-15.

Petitioner does not contest DPW's contention that as a subsidiary of Nursecare it is subject to the "home office"[11] provisions contained in HIM-15. Section 2150.3(E) of HIM-15, as it appeared in 1981 and 1982, stated as follows:

> E. *Inclusion in Provider Costs.*—Home office costs directly allocated to the providers should be included in each appropriate account in the provider's trial balance and then allocated through the provider's cost-finding process. For example, the allocated share of the *home office's allowable interest* is included in the provider's adjusted trial balance with the provider's own allowable interest cost. (Emphasis added.)

Interest, in order to be "allowable", must be "necessary and proper for the operation, maintenance, or acquisition of the provider's facilities." HIM-15, Section 202.1.[12] Further, in order to be "necessary", interest must "be reduced by investment income." HIM-15, Section 202.2.[13] Therefore, prior Section 2150.3(E) of HIM-15 provided that the home office's interest expense

---

[10] current version at 55 Pa. Code §1181.65(d)(1) and (2).

[11] These provisions state that a chain organization is made up of a group of two or more health care facilities which are owned by another organization. The home office is not a provider in itself and often charges management fees to the providers, which costs are included in the provider's cost reports. 1 Medicare and Medicaid Guide (CCH) ¶ 5999V. Petitioner claimed the costs of Nursecare's management services on its cost reports for 1981 and 1982. See, Finding of Fact No. 30 of DPW Adjudication; Notes of Testimony from March 26, 1985, hearing before hearing examiner (N.T.) at 47.

[12] 1 Medicare and Medicaid Guide (CCH) ¶ 4913.

[13] *Id.* at ¶ 4920.

was to be offset against its investment income and then allocated to the providers and included in their costs.

The provision has been clarified in the current version of Section 2150.3(E) re-designated as 2150.3(F),[14] which provides in pertinent part:

The provider's share of the net amount of home office *capital-related* interest expense and investment income is subject to offset by the provider's own capital-related investment income and included with the provider's capital-related costs. If the provider's share is a negative amount, it should be added to the provider's capital-related investment income and the combined amount used to reduce the provider's capital-related interest expense. (Emphasis in original.)

Thus we can see that prior Section 2150.3(E) of HIM-15, mandated that a home office's interest expense be reduced by its investment income and the net amount, (whether positive or negative), allocated to the provider and used to either add to or reduce its allowable interest cost. In the instant case, DPW allocated that percentage of Nursecare's interest income for 1981 and 1982, which corresponded to the percentage of Nursecare's total expenses attributable to Petitioner. Although the relevant provisions of HIM-15 permit a home office's income to be offset against a provider's capital indebtedness expense, former Section 2150-.3(E), together with Sections 202.1 and 202.2, require that the home office's interest expense is to be reduced by its investment income prior to any allocation to the provider.

Although the issue of whether DPW should have offset Nursecare's interest expense against its investment

---

[14] *Id.* at ¶ 5999V-3.

income before allocating the investment income to Petitioner was raised by Petitioner's Treasurer/Secretary at the hearing below, it was not raised in either the Petition for Review nor Petitioner's brief to us. Therefore, pursuant to Pa. R.A.P. 2116, we will not consider it. *See Workmen's Compensation Appeal Board v. Allied Chemical Corp.*, 20 Pa. Commonwealth Ct. 562, 342 A.2d 766 (1975) (issue not properly preserved for appeal where it was omitted from Statement of Questions Involved and addressed only in one sentence of petitioner's brief, citing former Commonwealth Court Rule No. 93, predecessor to Pa. R.A.P. 2116). However, we would simply note that had DPW offset Nursecare's investment income by its own interest expense prior to allocating the former to Petitioner, it still would have disallowed all of Petitioner's capital indebtedness expense for 1981. This is because Nursecare had $1,446.00 of interest expense in 1981[15] which when subtracted from its investment income of $47,912.00 leaves $46,466.00 in investment income. Therefore, $31,020.70[16] of Nursecare's investment income would have still been offset against Petitioner's capital indebtedness expense for 1981 of $15,010.00. Nursecare had interest expense of $22,129.00 in 1982,[17] which when subtracted from its investment income for that year of $43,985.00 leaves $21,856.00 of investment income. Therefore, $12,516.93[18] would still have been offset against Petitioner's 1982 capital indebtedness expense of $14,257.00.

---

[15] N.T. at 56.

[16] Net amount of interest income and interest expense multiplied by 66.76%.

[17] N.T. at 56.

[18] Net amount of interest and interest expense multiplied by 57.27%.

In *Tressler Lutheran Service Associates, Inc. v. Department of Public Welfare,* 100 Pa. Commonwealth Ct. 279, 514 A.2d 661 (1986), we held that DPW's offset of investment income earned in the home office against interest on capital indebtedness reported by its various nursing facilities was proper. Although we were presented with one corporation having various nursing facilities in *Tressler,* the rationale applied to that case is equally applicable here.

The purpose behind the offset rule is to prevent providers from borrowing funds at the expense of the Program and to deter excess borrowing. *See, Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 689 F.2d 1112 (1st Cir. 1982) (discussing rationale of offset rule under the Medicare Act at 42 C.F.R. §405.419(b)(2)(iii)).

In the "Discussion" portion of its Adjudication, the Office of Hearings and Appeals noted that both Petitioner and Nursecare had funds to invest for both years in question. It noted further that Nursecare, as the parent corporation, is able to obtain funds from Petitioner and therefore in a position to manage the provider's finances so as to avoid reducing its existing debts. Nursecare has complete ownership and control[19] of Petitioner despite the fact that it is a separate corporation. Therefore, we see no reason why our ruling in *Tressler*

---

[19] The Office of Hearings and Appeals found that Petitioner was permitted to claim as provider costs on its 1981 and 1982 cost reports, those costs incurred by Nursecare which were properly attributed to it. Petitioner's President testified at the hearing below that these costs were for management services rendered by Nursecare. N.T. at 47; Section 1000 of HIM-15, 1 Medicare and Medicaid Guide (CCH) ¶ 5679, permits costs applicable to services furnished to the provider by a related organization with common ownership and control, to be included in the provider's allowable costs.

should not apply to this case as well. If we permit reimbursement to Petitioner for its full capital indebtedness expense, without offsetting any of Nursecare's investment income, we discourage the parent corporation from employing the provider's funds to reduce its existing debts, as the interest expense is being subsidized by Program reimbursement.

We will address one last contention raised by the Petitioner. Section 202.2 of HIM-15,[20] provides that investment income in excess of allowable interest expense is not to be used to offset other operating expenses. This is consistent with the purpose of the offset rule which is to discourage unnecessary borrowing by providers since the interest earned on excess funds invested is used to offset the interest expense. Petitioner maintains that DPW effectively offset Nursecare's investment income against the costs of its management services in violation of Section 202.2. DPW only offset Petitioner's capital indebtedness expense by that percentage of Nursecare's investment income which corresponded to the percentage of its total expenses which could be attributed to management services rendered to Petitioner. That percentage of Nursecare's investment income was only used to offset Petitioner's interest expense as required by the home office provisions of HIM-15. Nursecare's excess investment income was not applied against other operating costs of the provider. Petitioner was still permitted to claim the costs of Nursecare's management services.

We conclude that DPW's adjustments to Petitioner's costs related to capital indebtedness expense for 1981 and 1982 were proper. Accordingly, we affirm the order of the Office of Hearings and Appeals.

---

[20] 1 Medicare and Medicaid Guide (CCH) ¶ 4920.

## ORDER

AND NOW, this 2nd day of October 1987, the order of the Department of Public Welfare, Office of Hearings and Appeals, dated April 10, 1986, in the above-captioned matter is hereby affirmed.